```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF HAWAII

 3
      UNITED STATES OF AMERICA,        ) CR 20-00068 LEK
 4                                     )
                  Plaintiff,           ) Honolulu, Hawaii
 5       vs.                           ) January 18, 2023
                                       )
 6                                     ) SENTENCING
      (1) NICKIE MALI LUM DAVIS,       )
 7                                     )
                  Defendant.           )
 8    _____)

 9                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE LESLIE E. KOBAYASHI
10                UNITED STATES DISTRICT JUDGE

11
      APPEARANCES:
12
      For the Government:        JOHN D. KELLER
13                               NICOLE R. LOCKHART
                                 SEAN F. MULRYNE
14                               United States Department of Justice
                                 Criminal Division, Public Integrity
15                               Section
                                 1331 F Street NW, Suite 300
16                               Washington, DC 20004

17                               KENNETH M. SORENSON, AUSA
                                 Office of the United States Attorney
18                               PJKK Federal Building
                                 300 Ala Moana Boulevard, Suite 6100
19                               Honolulu, Hawaii 96850

20    Also Present:             DARCIE ING-DODSON
                                Senior U.S.Probation Officer
21
      For the Defendant:        WILLIAM C. MCCORRISTON, ESQ.
22                              DAVID J. MINKIN, ESQ.
                                McCorriston Miller Mukai MacKinnon, LLP
23                              500 Ala Moana Boulevard Suite 5-400
                                Honolulu, Hawaii 96813

24

25
```

```
 1   APPEARANCES CONTINUED:

 2   Official Court Reporter:   Debra Read, RDR
                                United States District Court
 3                              300 Ala Moana Boulevard
                                Honolulu, Hawaii 96850
 4                              readit3949@gmail.com

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

UNITED STATES DISTRICT COURT

```
 1  WEDNESDAY, JANUARY 18, 2023                    1:31 P.M.

 2          THE COURTROOM MANAGER:  Criminal No. 20-00068 LEK,

 3  United States of America versus Nickie Mali Lum Davis.

 4          This case has been called for a Sentencing as to Count 1

 5  of the Felony Information.

 6          Counsel, please make your appearances for the record.

 7          MR. KELLER:  John Keller on behalf of the

 8  government, Your Honor, along with Sean Mulryne, Nicole

 9  Lockhart, and Kenneth Sorenson.

10          THE COURT:  All right.  Good afternoon to all of

11  you.

12          MR. MINKIN:  Good afternoon, Your Honor.

13          David Minkin, Nickie Lum Davis, and Bill McCorriston on

14  behalf of Ms. Lum Davis.  For the record, Mr. Bryant's

15  currently in trial in Central District of California USDC.

16          THE COURT:  All right.  Good afternoon to all of

17  you.  The record will reflect the presence of Ms. Lum Davis.

18          How are you today?

19          THE DEFENDANT:  Hi.  How are you?

20          THE COURT:  Good.  And the record will also reflect

21  the presence of United States Probation Officer, Ms. Dodson,

22  yeah -- Ing-Dodson.  Sorry, Darcie.

23          All right.  You may all be seated.

24          All right.  So I did receive a copy of the unsigned

25  forfeiture order, and now on the bench there's the signed
```

UNITED STATES DISTRICT COURT

1    forfeiture order.  So all parties have signed it, I noticed.  I

2    looked at it, so I understand that all are in agreement; is

3    that correct, Mr. Sorenson?

4          MR. SORENSON:  I think so, yes, Your Honor.

5    Mr. Minkin and I have worked together to get that before the

6    Court today, and it's acceptable to us.

7          THE COURT:  All right.  You agree, Mr. Minkin?

8          MR. MINKIN:  Yes, Your Honor.  We worked the past

9    couple of days to get the language where everybody was

10   satisfied.  Mr. Sorenson had to talk up a chain of command, but

11   that was resolved.

12         And in addition to that, we also have an agreed-upon

13   payment schedule that was signed that will not become part of

14   the record, but is signed, and Mr. Sorenson has a copy of that.

15         THE COURT:  All right.  So you're satisfied with

16   that, Mr. Sorenson?

17         MR. SORENSON:  Yes, Your Honor, I am.  Thank you.

18         THE COURT:  This is the forfeiture money judgment in

19   the amount of $3 million, correct?  And then there's

20   acknowledgements of the money judgment and that it'll become a

21   final judgment as to Ms. Lum Davis on the date it's entered by

22   the court and be part of the sentence and included in the

23   judgment of conviction.

24         MR. SORENSON:  Yeah, I think just to make sure we're

25   clear, there's kind of two things going on here.  There's a

UNITED STATES DISTRICT COURT

1  preliminary order of forfeiture with respect to the $40,000,

2  and then there's a final order of forfeiture with respect to

3  the restitution funds and that's $3 million.

4       So there'll be a final order of forfeiture coming once

5  we've done a publication to see if anybody else wants to claim

6  any rights to the 40,000, the ancillary hearing portion.

7            THE COURT:  Well, says here, "So shall forfeit the

8  sum of 3 million, then a money judgment in the amount of 3

9  million is entered against the defendant."

10           MR. SORENSON:  And that has to be part of the

11 sentencing.

12           THE COURT:  Right, that has to be part of the

13 sentencing.  And then you have a separate one as to the

14 forfeiture money judgment, right?  In terms of --

15           MR. SORENSON:  Well, there's $40,000 that was

16 seized, and the parties have agreed that that is forfeitable as

17 well, and this is the preliminary order of forfeiture for that.

18           THE COURT:  Okay.  But it's the final as to the

19 money judgment, the 3,000?

20           MR. SORENSON:  Yes, Your Honor.

21           THE COURT:  I mean, 3 million, yeah.

22           MR. SORENSON:  And if the Court needs more time with

23 the order or wants a little more explanation from us, we're

24 happy to give it.

25           THE COURT:  Okay.  I'm going to look at it then

UNITED STATES DISTRICT COURT

1    after the hearing and then I'll assume I'll sign it, but I want

2    to take a little more time to take a look at it.

3            MR. SORENSON:  Thank you.

4            MR. MINKIN:  Thank you, Your Honor.

5            THE COURT:  All right.  Ms. Lum Davis, if you would

6    stand.

7        So we're here at your sentencing hearing.  At the hearing

8    I'm going to make certain findings.  I'm going to go over what

9    I believe to be the aggravating and mitigating factors in your

10   case, and then I will ask each of the attorneys to give me

11   their position, first the government on what is an appropriate

12   sentence for you, and then your attorneys will have an

13   opportunity to state that.

14       You'll have an opportunity to speak on your behalf, if

15   you wish.  You don't have to and it certainly won't be held

16   against you if you don't.

17       And the whole purpose of this, in addition to the very

18   complete presentence report, is for me to gather as much

19   information as possible to determine an appropriate sentence

20   for you.  And under the law an appropriate sentence is one that

21   is sufficient, but not greater than necessary, to meet the

22   goals of sentencing, which includes just punishment for the

23   offense to which you have pled guilty and been convicted of, to

24   dissuade you and others from committing that kind of harm to

25   our community, and to give you an opportunity for

UNITED STATES DISTRICT COURT

1    rehabilitation.  All right?

2        So let me first start by asking you if you and your

3    attorneys have had a full and fair opportunity to read, review,

4    and discuss the presentence investigation report and any

5    addendum and to file objections to that report.

6        Have you had that opportunity?

7            THE DEFENDANT:  Yes, I have, Your Honor.

8            THE COURT:  All right.  You would agree with that,

9    Mr. Minkin?

10            MR. MINKIN:  Yes, Your Honor.

11            THE COURT:  All right.  You may be seated.

12        Court makes the following findings:

13        That on August 31, 2020, Ms. Lum Davis pled guilty to a

14    single-count Information charging her with Count 1, aiding and

15    abetting violations of the Foreign Agents Registration Act, in

16    violation of federal law.

17        I now accept her Rule 11(c)(1)(A) plea agreement because

18    I am satisfied that the agreement adequately reflects the

19    seriousness of the actual offense behavior, and that accepting

20    the plea agreement will not undermine the statutory purposes of

21    sentencing.

22        I now place the presentence report in the record under

23    seal.  If an appeal is taken, counsel will have access to all

24    of the report.

25        There are several related cases to this one including:

UNITED STATES DISTRICT COURT

 1          In the Eastern District of New York case number Criminal

 2    18-00538MKB, Defendant 1 is Low Taek Jho;

 3          In the District of Columbia case Criminal No. 18-343CKK,

 4    Defendant No. 1 is George Higginbotham;

 5          And then there's also a District of Columbia case

 6    Criminal No. 19-00148CKK, Defendant 1 is Prakazrel Michel,

 7    P-r-a-k-a-z-r-e-l Michel, Defendant No. 2 is Low Taek Jho,

 8    T-a-e-k, Jho, J-h-o;

 9          And the District of Columbia case Criminal

10    No. 20-00210CKK, Defendant No. 1 is Elliott Broidy.

11          There have been many letters in support and I have read

12    all of them.

13          Does the government have any remaining objections to the

14    factual findings or the application of the guidelines to the

15    facts?

16                MR. KELLER:  No, Your Honor.

17                THE COURT:  All right.  Mr. Minkin?

18                MR. MINKIN:  No, Your Honor.

19                THE COURT:  All right.  So there were objections

20    filed; an addendum was prepared.  Given the parties' position,

21    they accept the explanation set forth in the addendum.  The

22    court adopts those and adopts the factual findings in the

23    presentence report.

24          With regard to Ms. Lum Davis's offense to which she pled

25    guilty, there is no applicable guidelines;

```
 1          There is a recommendation by probation that the
 2   supervised release guideline provisions are 1 to 3 years;
 3          There's no guideline for the fine;
 4          And of course there's a mandatory $100 assessment for the
 5   offense.
 6          So these are the factors the court sees in aggravation.
 7   First, turning to the nature and circumstances of the offense,
 8   for a significant period of time, at least between March 2017
 9   and January 2018, you agreed to act as an agent for a foreign
10   national in exchange for millions of dollars.
11          You agreed to use your political connections to lobby the
12   administration of the president of the United States and the
13   Department of Justice to drop investigations and various
14   aspects for foreign nationals.  This involved a lot of money.
15   A lot of financial gain on your part alone was $10 million for
16   your efforts to use your influence to subvert justice.
17          This involved serious crimes for profit.  The use of
18   influence harms our community's sense of fairness and access to
19   justice and is an affront to law-abiding citizens.
20          Turning to your personal characteristics, you've shown no
21   remorse or taken responsibility in this case.  After pleading
22   guilty and giving testimony under oath admitting to the facts
23   underlying your offense, you have now tried to disavow any
24   responsibility and tried to blame your change of plea on your
25   former counsel in a misguided attempt to rewrite history.
```

1          On the other hand, there are factors in mitigation.  You

2    have no prior criminal history.  You have no history of

3    violence, no history of criminal -- drug addiction or abuse,

4    and no history of mental illness.  So these indicate that

5    they're showing factors against recidivism.

6          In addition, you're highly educated; you have a college

7    degree.  You have strong ties to the community.  You have

8    family support from your husband and daughter, your parents and

9    extended family.

10         You've done fine on pretrial release.  You've been

11    compliant with all of your conditions.  You've done community

12    service and have connections with many high-ranking members of

13    our community as evidenced by your letters in support.

14         And although the government has not filed a motion on

15    your behalf, the court does take notice that you gave grand

16    jury testimony under oath that no doubt assisted the government

17    in some aspect and resulted in the indictment of at least one

18    individual.  So those are the factors the court sees in

19    mitigation.

20         So now I'll turn to the government for their position on

21    sentencing, and in particular because there are no guidelines,

22    I know you folks are asking for a sentence of 30 months of

23    incarceration to be followed by supervised release.  I'd be

24    interested in particularly addressing the nature and

25    circumstances of the offense.

1          MR. KELLER:  Yes, Your Honor.  Court's indulgence

2  for just a moment while I get set up.

3          THE COURT:  Yes.

4          MR. KELLER:  Ms. Elkington, are you able to turn on

5  the monitors to display this?

6      So, Your Honor, I do want to start with the nature and

7  circumstances of the offense.  There's been very different

8  presentations of the defendant's role and of the seriousness of

9  this offense overall from the parties in this case.  And I

10  think rather than -- or in addition to some limited additional

11  advocacy here, it would be helpful for the Court to see some of

12  the key evidence that highlights the offense as a whole and

13  also the defendant's role in the offense.

14      These are all exhibits that have been attached to the

15  government's sentencing memo and some excerpts from some of the

16  defendant's filings as well.

17      So as the Court noted, this offense started in earnest in

18  March of 2017 between the defendant and Elliott Broidy and Pras

19  Michel where they decided to try and sell their services to a

20  foreign national, Low Taek Jho, who was under investigation for

21  a multi-billion dollar kleptocracy embezzlement scheme from the

22  Government of Malaysia.  And because he had stolen or was

23  alleged to have stolen so much money, he had assets all over

24  the world, including in the United States.

25      And so the Department of Justice was investigating him

1   and was -- had initiated forfeiture actions to seize assets

2   that they believed had been purchased with funds from -- from

3   the Government of Malaysia that had been embezzled by Mr. Low.

4         And Mr. Low was seeking someone with influence in the new

5   administration with President Trump to try and resolve the case

6   favorably, hopefully make the case go away, or at least allow

7   him access to all of his funds in the United States, his

8   assets, and to be able to travel freely back and forth to the

9   United States.

10         So grand jury Exhibit 2 from the Government's Sentencing

11   Memo, a subexhibit to Exhibit 1, this just shows from the very

12   beginning, March 3rd, Ms. Lum Davis is corresponding with Erica

13   Hilliard who is an assistant for Mr. Broidy, and the critical

14   line here is the last line, "Lastly do you have any photos of

15   Elliott with the president?"

16         So from the earliest days, it's clear that the defendant

17   understood that the whole purpose of this arrangement was to

18   emphasize Mr. Broidy's access and influence and relationship

19   with the president.

20         She gets some photos, Ms. Lum Davis.  The defendant asks

21   for additional photos, something more casual.  This isn't a

22   very good version of it, but gets a photo back of Mr. Broidy

23   and President Trump there to send to Mr. Low to try and

24   convince him that Mr. Broidy was someone that could actually

25   assist him in his effort to have the embezzlement

1   investigations dropped.

2       At around the same time Ms. Lum Davis is communicating

3   with Pras Michel who had access to Mr. Low, and she is again

4   touting Mr. Broidy and his access and value to the

5   administration.  So she's texting Mr. Michel at the top line,

6   "Elliott Broidy, he raised the most money of any person for

7   Trump and was the Finance Chair for President George W. Bush."

8       So there's a meeting between Ms. Lum Davis and Mr. Michel

9   and Mr. Broidy.  They start finalizing what their pitch is

10  going to be to Mr. Low, selling, again, Mr. Broidy's access and

11  influence with the administration.

12      And this looks misleading -- the date at the top is

13  just -- it's a different formulation.  It's actually

14  March 12th, not December 3rd, 2017.  You'll see in the

15  attachments that they're March.  But so Mr. Broidy's wife,

16  Robin Rosenzweig, who is a lawyer -- Mr. Broidy's not a

17  lawyer -- provides these documents to Ms. Lum Davis for her

18  review.  It's a draft contract between Ms. Rosenzweig's law

19  office Colfax and Jho Low, and then a consulting agreement

20  between Colfax and Ms. Lum Davis.

21      And the -- the agreement essentially calls for legal

22  services, but as the Court is aware of and as you'll see in

23  these exhibits, this was never about legal services.

24  Mr. Broidy was not a lawyer.  Ms. Rosenzweig wasn't in the

25  initial meetings with Mr. Michel and Ms. Lum Davis and was --

1   Rosenzweig didn't travel to Bangkok, she didn't travel to Hong

2   Kong, she was not involved in this effort at all.  It was all

3   about Mr. Broidy.

4        Ms. Lum Davis understood it, that's why she wanted the

5   photos of Mr. Broidy with the president, and yet they used

6   from, again, the very beginning pretext to try and legitimize

7   what they were doing, to try to conceal the true purpose of

8   what they were doing, and to try to cloak themselves in the

9   protections of the attorney-client privilege.

10       This is, as you said, an offense that involved a lot of

11  money.  The initial draft contract called for a retainer of

12  $8 million and a potential success fee of $75 million.

13       This is the Consulting Services Agreement, and at the

14  bottom just on the point of trying to use a illegitimate

15  attorney-client relationship, the Consulting Services Agreement

16  also attempts to cloak the work in the attorney-client

17  privilege.  And Ms. Lum Davis was -- had negotiated a

18  significant fee for her efforts in this -- in this scheme,

19  25 percent of the retainer fee and 25 percent of that

20  $75 million success fee.

21       So the best evidence that the government has in this case

22  as to what was -- what was happening, outside of the testimony

23  from different cooperating witnesses, is an extensive text

24  message chain that spans the entire offense between Ms. Lum

25  Davis, the defendant, and Mr. Broidy, and these are some

1    excerpts from that text message chain that I think demonstrates

2    how active Ms. Lum Davis's role was in this.  She was not just

3    a passive facilitator, but that she was often driving the

4    influence campaign, the potentially most harmful aspects of

5    this influence campaign.

6        So this again is early March.  Ms. Lum Davis is asking

7    for photos, asking for the names of the potentially incoming

8    U.S. Attorney who had jurisdiction over the 1MDB investigation

9    into Jho Low Nathan Hackman, again asking for photos, trying to

10   set up a meeting between Mr. Broidy and Mr. Michel.  "Pras" is

11   the reference there, prior to his travel that weekend to Asia,

12   so they knew that Mr. Michel was going over to meet with

13   Mr. Low to kind of sell this arrangement to Mr. Low.

14       Mr. Broidy, mid March, "Anything new on Ong?" which is an

15   unrelated individual or Pras's associate.  You'll notice in

16   these text messages the defendant and Mr. Broidy consciously

17   avoid ever mentioning Jho Low by name because, again, evidence

18   of a consciousness of guilt; they know that they should not be

19   working on behalf of this foreign fugitive and they don't want

20   to be readily associated with him, and so you'll see that

21   there's never a reference to Mr. Low by name.

22       So Pras's associate, "Pras is meeting in person tomorrow

23   with the promoter," again Low.

24       Ms. Lum Davis sending an article to Mr. Broidy giving him

25   an updates about the status of the forfeiture lawsuits.

1          This is Ms. Lum Davis in April now telling Mr. Broidy,

2    "It looks good with Pras.  Call me."

3          Mr. Broidy asking for updates, "Should I work on

4    reservations?"  And at this point the co-conspirators are on

5    the verge of traveling to Bangkok to meet with Low in person to

6    explain to him what Mr. Broidy can do with his influence to the

7    president and to potentially attorney general to try and make

8    this embezzlement case, one of the largest kleptocracy cases

9    ever charged in the history of the Department, to make it go

10   away.

11         Again reference to "the principal" there by Mr. Broidy,

12   no reference to Jho Low.  Or, that is a reference to Jho Low,

13   but not by name of course.

14         And so the co-conspirators do go to Bangkok, they meet

15   with Low this is early May.  Basically May 2nd to May 6th they

16   have their meeting with Mr. Low.  They reach an agreement and

17   understanding that he will pay Mr. Broidy in order to use his

18   influence to try and get the administration to drop the 1MDB

19   investigation and negotiate the fees in the millions of

20   dollars.  So when they return, Ms. Lum Davis is telling

21   Mr. Broidy, "The wires are in to your wife's law firm from

22   Pras," and that there was an additional $702,000 cashier check

23   deposited.

24         And then you also notice that for the first time after

25   this trip to meet with Mr. Low in Bangkok, Mr. Lum Davis and

UNITED STATES DISTRICT COURT

1   Mr. Broidy start referencing encrypted apps.  So Wickr is an

2   app that makes it virtually impossible for law enforcement to

3   access the contents of the communications.  It also has a

4   feature where your messages can disappear.  And so they start

5   not only not mentioning Jho Low by name, but using these

6   encrypted apps so that, again, they can disguise kind of the

7   evidence of their criminal activity.

8        This is a back and forth about incoming wires that came

9   in, so they got roughly $3 million around May 5th.  They got

10  another 3 million May 12th and then another 3 million May 25th.

11  And Ms. Lum Davis is updating Mr. Broidy on the status of the

12  payments.  She says, "Baby steps, at least moving forward now."

13       Mr. Broidy says, "Hammer them for the next two wires."

14       This scheme was always about money.  It wasn't about

15  patriotism, it wasn't about trying to return hostages.  It was

16  always about money.

17       Shortly after that trip to Bangkok, the co-conspirators

18  returned to Hong Kong to meet with Mr. Low again, and this time

19  not only with Mr. Low, but with the Vice Minister for Public

20  Security for the People's Republic of China Sun Lijun.  So they

21  travel around May 18th to Hong Kong, they are whisked into

22  China to Shenzhen to a hotel.

23       They meet with Mr. Low briefly and then meet with Sun

24  Lijun and his entourage, and Mr. Lijun tells him that China

25  wants a prominent critic of the Chinese government returned to

UNITED STATES DISTRICT COURT

1    China, someone who is seeking safe haven as a -- as a -- as a

2    politically persecuted person.  This individual, Guo Wengui,

3    China wants him back.  They want to be able to prosecute him

4    and they are concerned, the government's concerned, because

5    he's been such an outspoken critic of the government.

6         They meet with Mr. Lijun.  Mr. Broidy again sells his

7    services to Mr. Lijun:  how he can influence the

8    administration, how he can help arrange for the removal of this

9    Chinese dissident.

10        And they return to the United States on May 20th.  You

11   see the second to last message there Mr. Broidy says, "I'll try

12   to make this a big week for us with Jeff," referencing Jeff

13   Sessions, the Attorney General at the time, and then, of

14   course, "check Wickr."

15        Ten days later, ten days after the co-conspirators

16   return, Mr. Lijun, the Vice Minister for the People's Republic

17   of China, travels to the United States to try and meet with

18   high-level U.S. officials to get them to agree to send this

19   Chinese dissident back to China.  Ms. Lum Davis and Mr. Broidy

20   were actively involved in trying to set up these meetings.

21        So you see here Ms. Lum Davis says, "Checked Wickr.  All

22   clear now for meetings."

23        Mr. Broidy says, "Yes.  All set."

24        Ms. Lum Davis, who is in contact with the Vice Minister

25   of China at this point, "He got his meetings reinstated."

1          Mr. Broidy says, "I'm in D.C."

2          Ms. Lum Davis again at the bottom referencing Wickr and

3     the fact that the messages disappear after an hour.

4          Ms. Lum Davis asking about a meeting with at that time

5     Secretary of Homeland Security John Kelly, a meeting between

6     Vice Minister Lijun and John Kelly, "In principal is the

7     meeting with Kelly okay? It's just a schedule issue?"

8          Mr. Broidy says, "Just a schedule issue."

9          And then Mr. Broidy says down below, "Please pass along

10    my good wishes to the vice minister," because Ms. Lum Davis is

11    the one who's in contact with the vice minister directly, "Wait

12    a little while longer."

13         Ms. Lum Davis, "Yes, I'm telling him that."

14         And then Mr. Broidy continues, "Tell him that I'm telling

15    the White House and Sessions what happened."

16         There's some back and forth about a scheduling order

17    conflict and the fact that Mr. Kelly is not going -- Secretary

18    Kelly is not going to be able to meet with the Vice Minister.

19         Ms. Lum Davis says, "Just spoke with the Vice

20    Minister" -- the third message from the bottom -- "He sounded

21    like he was crying.  It's really sad."

22         Mr. Broidy says, "Terrible.  What a mess.  Bottom line

23    it's not our fault.  Normally their ambassador would handle."

24    But this wasn't regular orders.  This wasn't normal operations.

25    That's the whole point.  It was a backchannel follow-up effort

UNITED STATES DISTRICT COURT

1  being conducted by Mr. Broidy and Ms. Lum Davis along with

2  others, including Mr. Michel.

3      So after the failure to secure meetings for the vice

4  minister, Ms. Lum Davis pivots to the other piece that they're

5  working on which is the 1MDB investigation, the embezzlement

6  charges against Low, and trying to get that dropped, and so she

7  asks, "Any word on a date?"  And that's a date for a meeting

8  that they were trying to get between then-President Trump and

9  then-prime minister of Malaysia, Najib Razak.

10      And so Ms. Lum Davis pivots from the meeting with Sun

11  Lijun regarding the deportation of this individual Guo Wengui,

12  "Let's move back to 1MDB and trying to get that dropped and

13  trying to get a meeting set up between the president of the

14  United States and the prime minister for Malaysia.  Any word on

15  a date.  Let's focus on the other thing.  Distract and redirect

16  our client."  Again, this is a business.  This is trying to

17  show progress so that they can get more money out of these

18  foreign principals.

19      Again, Ms. Lum Davis relaying to Mr. Broidy what Jho Low

20  is saying, "J keeps calling for news."

21      "I will work on J and Asian country," Jho Low and

22  Malaysia."

23      Ms. Lum Davis is sending Mr. Broidy an article on Guo

24  Wengui, and Mr. Broidy saying, "It's getting nasty."

25      Ms. Lum Davis sending another article about the 1MDB

1   scandal and the embezzlement from 1MDB and telling Mr. Broidy,

2   "Call me so we can craft a message," again demonstrating that

3   she's playing an active role in the strategies that they're

4   employing and in how they are going to approach this influence

5   effort.

6       Ms. Lum Davis again relaying messages, "He'd like to

7   speak with you this evening, principal," no reference by name,

8   but a reference to Jho Low.

9       Following up with Mr. Broidy, "E, any news?  Check Wickr,

10  please.  Are we able to check in with him?  Is rejection or

11  acceptance letter already generated?"  They're talking about

12  acceptance or rejection of a visa renewal that Mr. Guo Wengui

13  was seeking, and again, China didn't want his visa to be

14  renewed because they wanted him kicked out of the country.

15      Ms. Lum Davis now saying, "You are the man.  They're

16  going to give you the President's Medal of Freedom Award after

17  what you accomplished for this country."  This is in reference

18  to this potential prisoner exchange between China and the

19  U.S. -- U.S. sending Guo -- or not prisoner exchange, but

20  hostage exchange -- U.S. sending Guo back to China, China

21  sending U.S. hostages back to the U.S.

22      And then Ms. Lum Davis says just two lines down, "And

23  date for M," date for Malaysia.  "Don't leave that dude until

24  we do it," that dude being Reince Priebus who was then the

25  chief of staff for the president of the United States.

1          Mr. Broidy responding, "Heard from Steve," that's Steve

2     Wynn who had also close connections and relationship to the

3     President.  "He reiterated to POTUS the importance of this Guo

4     issue," trying to get Guo sent back to China, again all being

5     directed by the Vice Minister of Public Security for China.

6     Separately, "RP" -- that's Reince Priebus -- texting, "He got

7     tied up but is also on top of it."

8          So these are contacts with the president himself and his

9     chief of staff, the highest levels of our government that these

10    individuals were able to accomplish not because they were

11    informed or because they had an official position or that they

12    were doing what they thought was best for the country, but

13    because they were being paid hundreds of millions of dollars

14    ultimately to serve a foreign agenda that was not in the best

15    interest of our foreign policy or our national security.

16         Ms. Lum Davis again actively pushing Mr. Broidy, "Can we

17    get proof today about revoke?"  -- the revocation of Mr. Guo's

18    visa from Reince Priebus -- "Can we get proof today about

19    revoke?" telling Mr. Broidy on behalf of China that there's a

20    call scheduled between president of China, Xi Jinping, and

21    Trump and that she can ask and confirm about the package, the

22    package being Guo Wengui who China wanted sent back.  "He can

23    even say he heard it from Steve Wynn," the president can even

24    say he heard it from Steve Wynn, trying to script the details

25    of a call between the president of the United States and Xi

1    Jinping.  Just additional pressure, additional references to

2    high-level officials that Mr. Broidy was trying to influence up

3    to the National Security Council, McMaster -- was H.R.

4    McMaster who was the National Security Advisor at the time.

5          Ms. Lum Davis sending another article about the Prime

6    Minister Najib Razak who is facing re-election, "Let's harass

7    this dude again.  It's 3 P.M.," talking about Najib Razak and

8    the president.

9          "I think we need to make a move."  This is the defendant

10   again to Mr. Broidy.  "Date and otherwise we're getting killed.

11   Please call because we need to strategize.  I'm getting

12   inundated."

13         The messages continue.  This is another reference to the

14   White House Chief of Staff Reince Priebus, "I'd like him to

15   give us the date now, and ask him for an update on the other

16   thing.  We look impotent.  We really need this date.  It's been

17   crazy for me all day with this.  He's panicking.  Just ask him.

18   This F head needs to make it happen," a reference to Reince

19   Priebus.  "This date is mandatory.  Today we're getting

20   creamed."

21         Mr. Broidy says, "Calling Reince Priebus now.  Call

22   everyone so they know you're raging mad.  Call Madeleine too.

23   We need this today," Madeleine Winetraub[*sic*], the personal

24   assistant to President Trump.

25         Additional references to Steve Wynn, the date for the

UNITED STATES DISTRICT COURT

1    meeting, additional kind of examples of Ms. Lum Davis driving

2    this activity:  "Are you able to speak?"

3            "Do you have any movement on the date?"

4            "You're leaving us hanging here, it's not right."

5            "The guy didn't get to POTUS.  Steve Wynn didn't get to

6    POTUS."

7            "Really need to confirm it was officially transmitted

8    back to Jho Low, the Chinese, regarding the meeting for the

9    Malaysians.  At this point he says no."

10           And then finally the meeting is actually set up so they

11   get a meeting for September 12th between President Trump and

12   the prime minister for Malaysia, Najib Razak.  They were told

13   September 12th was the meeting.  Ms. Lum Davis said, "That's

14   the day U.N. General Assembly starts.  No golf?" because they

15   were also trying to set up an informal meeting, a golf game

16   between the leaders.

17           And then the day before the meeting, the prime minister

18   for Malaysia, Najib Razak, was in D.C. and Mr. Broidy and

19   Ms. Lum Davis met with him to prep him for his meeting with the

20   president.  And Ms. Lum Davis helped draft or edit a letter to

21   be sent to the president from Mr. Broidy to set the table for

22   the meeting with Najib Razak.

23           So that shows both that this was not some hypothetical

24   agreement without any teeth to it, this was not just bluster,

25   but this was the co-conspirators actively strategizing and

1    taking affirmative steps to try and actually influence the

2    president of the United States directly, his attorney general,

3    his national security council, his chief of staff, to bring

4    about results that while potentially didn't endanger American

5    lives, were -- would have been a travesty for our justice

6    system, both for the abandonment of this investigation into one

7    of the largest foreign embezzlement kleptocracy schemes ever

8    charged and sending a Chinese national back to China without

9    due process of law, without going through extradition, so that

10   he can be persecuted in China because of his critical views of

11   the Chinese government.

12        This demonstrates the seriousness of the offense.  It

13   also demonstrates that the defendant did not play some backseat

14   passive role where she was just there as a facilitator.  She

15   was the one driving a lot of this activity and driving the

16   strategy and the means by which this influence effort would be

17   carried out.  And she wanted to be able to show results because

18   she wanted to be able to continue to obtain money from these

19   foreign sources.

20        In the defendant's sentencing papers they have emphasized

21   the defendant's cooperation and the Court referenced her

22   cooperation today and noted that the government had not made a

23   motion.  And the government hasn't made a formal motion in part

24   because of what I'll talk about here in just a second, but also

25   because, as the Court noted, there are no guidelines in this

1    case and so a motion under Section 5K1.1 of the guidelines

2    wouldn't make sense because there is no applicable guideline.

3         But the government has taken into account the fact that

4    Ms. Lum Davis did plead initially and did at least appear to

5    cooperate with the government's investigation, and that has

6    influenced the government's sentencing recommendation.

7         But on the -- on the issue of cooperation, in her plea

8    agreement the defendant agrees -- this is at paragraph 8a(5) of

9    her plea agreement -- that Person B -- and that's a reference

10   to Mr. Broidy -- falsely assured her that their work would

11   consist of legal representation.  She -- "It became clear to

12   the defendant that the lobbying efforts did not constitute

13   legal representation and required registration and disclosure

14   under FARA.  The defendant deliberately and consciously avoided

15   revisiting FARA and willfully failing to register under FARA by

16   continuing to work on behalf of Foreign National A and PRC

17   Minister A."  She admitted that under oath as part of her plea

18   agreement in this case.

19        And then in grand jury, the defendant addressed it again

20   in her testimony under oath.  The question that she was asked,

21   "Did you have a concern that based on those contacts he,

22   Mr. Broidy, needed to register under FARA and publicly disclose

23   that he was working on behalf of Jho Low?"

24        And she says, "It was more that he was now in contact

25   with government officials trying to get this date for the prime

1    minister to get together with Trump, so I did ask him about it.

2    I said, 'Do you think that you should register?'"

3         "What did he say?"

4         "He said, 'No, because Jho Low's a client,'" and she

5    outlines this conversation.  She says they had multiple

6    conversations about FARA in 2017 while their conduct was

7    ongoing.  She says that Mr. Broidy was emphatic that he didn't

8    need to register, and if he did, then he would.

9         It rose to the level of an argument or a heated

10   discussion because she said she told him, "Don't you think you

11   should register, that you need to register?"

12        And she said that he said, "No.  You got a legal opinion

13   on it."

14        Then she says that she -- she was asked, "Did you mention

15   this to Mr. Michel?"

16        And she says, "Just in terms of telling him the

17   conversation that Elliott felt he did not need to register."

18        She was asked, "But you were concerned that maybe he

19   should register?"

20        She says, "Right."

21        "Did Mr. Michel have any response?"

22        "I don't believe that Mr. Michel said anything about it.

23   I think it was something I made a comment on in one of our many

24   conversations."

25        So this is testimony in grand jury in on ongoing

UNITED STATES DISTRICT COURT

1    investigation of a co-conspirator, Mr. Michel, on this issue.

2    In her -- in her pleadings in this case in direct contradiction

3    of her factual basis and her plea agreement, Ms. Lum Davis has

4    submitted that she did not believe that either she or

5    Mr. Broidy were required to register under FARA.  She formed

6    this understanding based upon her discussions with Mr. Michel,

7    who assured her that his partner, then-DOJ Attorney George

8    Higginbotham, was ensuring legal compliance for their efforts,

9    as well as with Mr. Broidy who told her that he consulted with

10   legal counsel who confirmed that he was not required to

11   register under FARA.

12        She said nothing about Mr. Michel assuring her that she

13   didn't need to register in grand jury.  She said -- in fact,

14   she said Mr. Michel said nothing about FARA when she raised it,

15   and her testimony was in contemplation of a prosecution that is

16   now pending against Mr. Michel.

17        She is now after not disclosing potentially exculpatory

18   information, if this is true, as to Mr. Michel in grand jury,

19   then in a self-serving effort to get out of her plea she has

20   generated potentially exculpatory information for Mr. Michel

21   and she's asking this Court to give her credit for cooperation

22   when she either lied under oath in this courtroom as a part of

23   her plea or in grand jury, or she lied in these submissions in

24   an effort to get out of her plea.

25        There are additional examples, but I think the

1    Court -- the Court understands the point on cooperation.  She
2    did tell the government some things that the government has
3    been able to corroborate and confirm and the government
4    believes she was truthful as to some facts.  But cooperating
5    partway in a federal investigation where federal criminal
6    charges and people's liberty is at stake is not cooperation,
7    and so any credit that she should get for cooperation should be
8    minimal here.
9         As to the defendant's contrition or acceptance of
10   responsibility, as the Court noted, she has shown none, and I
11   think that's illustrated by her efforts to distort and
12   manipulate these proceedings to try and either get her out of
13   her plea agreement to avoid responsibility and the consequences
14   of her actions, or to try and distract the Court from her
15   conduct and to gain the Court's sympathy in mitigation of her
16   conduct.
17        But this effort, this entire past year of litigation on
18   frivolous issues to delay her sentencing, to potentially try to
19   get out of her sentencing, the denial, recantation of factual
20   basis, these things don't mitigate her offense, they aggravate
21   her offense.  They aggravate the fact that she -- that
22   punishment must be sufficient to address her lack of contrition
23   and acceptance of responsibility.
24        Your Honor, we're fortunate in this country that there
25   aren't very many examples of efforts to advocate on behalf of

 1   foreign governments or foreign principals at the highest levels
 2   of our government in exchange for millions of dollars.  We
 3   don't have many examples to point to and I think we should all
 4   be grateful for that.  I think the reason why there aren't many
 5   examples to point to -- although we have highlighted some in
 6   our sentencing papers, including the prosecution of
 7   Mr. Manafort and the prosecution of Tongsun Park, and the
 8   prosecution of Imaad Zuberi, all of whom were initially given
 9   maximum sentences under the FARA statute of 60 months for their
10   conduct, conduct which is largely analogous in many ways to
11   Ms. Lum Davis and her co-conspirators' conduct in this case --
12   but there are relatively few examples because very few people
13   have the connections that the defendant and her co-conspirators
14   had in this case:  direct access and connections and influence
15   with the president of the United States?  with the attorney
16   general?  with the White House chief of staff?  Very few people
17   have that kind of access and thankfully even fewer people who
18   do have that access are willing to sell it to the highest
19   foreign bidder.
20        The potential harm to our country of having these secret
21   foreign-guided efforts to shape our foreign policy and
22   decisions in all our prosecutions in the Department of Justice
23   cases and decisions about whether people seeking asylum in
24   United States should be sent, without judicial process, back to
25   another country, these are -- these are efforts that strike at

1    the very core of our democracy.  They undermine the most

2    important principles that we stand for which is due process of

3    law, even-handed administration of justice.  And the defendant

4    was willing to subvert those for her own profit and she

5    profited substantially, along with her co-conspirators.

6         This conduct needs to be deterred.  People are watching

7    what's happening in this case all over the country, all over

8    the world, seeing how seriously this conduct is going to be

9    treated, and there are others who are still pending prosecution

10   in this case who also are watching.

11        And so the Court should consider the need to avoid

12   unwarranted sentencing disparities with the few examples that

13   we do have that are largely analogous, and also must consider

14   the importance of the deterrent effect in -- to some -- in some

15   respect as to the defendant, but more importantly, as to the

16   community, the global community as a whole for what our justice

17   system's reaction is to this kind of conduct.

18        The government recommends a sentence of 24 to 30 months

19   as sufficient, but not greater than necessary, to address this

20   conduct.  And again, that recommendation is based on, in part,

21   as a reflection of Ms. Lum Davis's guilty plea and the initial

22   cooperation in this case.

23        Thank you, Your Honor.

24        THE COURT:  All right.  Thank you very much.

25        Mr. Minkin, will you be arguing?

1              MR. MINKIN:  Yes, Your Honor.  Thank you.

2         What we have here is a situation that is unique in and of

3    itself, aiding and abetting a FARA violation.

4         Good afternoon, Judge Kobayashi.  Let me start, Your

5    Honor, with what cannot be disputed.  Nickie's days begin and

6    end with her daughter.  She is a mother, she is a wife, she is

7    a daughter, she is a friend.  This situation that she finds

8    herself in has deeply affected everyone around her and it will

9    affect them for years to come.

10             THE COURT:  I agree, Mr. Minkin.  I mean, every

11   person that I sentence, I understand I sentence not only them

12   to prison, but their families.  Whether it's some poor kid from

13   Kalihi who's been caught up in a drug conspiracy, drug

14   trafficking, or your client who's had the benefit of tremendous

15   education, community support, family support, you know, when

16   they go to prison, their whole family goes to prison.

17             MR. MINKIN:  No --

18             THE COURT:  But there's not anything particularly

19   unique about that, though.  I mean, my sympathy to the family

20   and her daughter in particular, but that happens in every case

21   and the court's very much aware of that.

22             MR. MINKIN:  I know.  And what we look at is that

23   we've entered into an agreement.  We stipulated to the

24   forfeiture of $3 million-plus.  We've agreed to a payment plan

25   with the government as to how that will get paid based upon

1  what this Court does here today, and that's important because

2  that money will basically be taken out of the pocket of Ms. Lum

3  Davis and go back to the government, and that amount is a

4  little more than 3 million.

5      The government talks about 10 million on the one hand,

6  but the forfeiture only deals with 3 million, and that, I

7  think, is important.

8      I think also what we have is a situation where we have

9  the individual, Mr. Broidy, who has all of these contacts.

10  Mr. Broidy was pardoned.  Mr. Manafort was pardoned.  We have

11  an individual here who basically had an agreement with the

12  government, and at page 33 of that Memorandum of Plea,

13  Section 13a(2), Ms. Lum Davis had an absolute right to try to

14  challenge her plea based on a claim of ineffective assistance

15  of counsel.  This is a document that was not drafted by Ms. Lum

16  Davis.  This was a document drafted by the government in

17  anticipation of what, Your Honor?  In anticipation of what?

18  That's the question.

19      THE COURT:  Well, it's standard language that's in

20  every Memorandum of Plea Agreement that I've ever been given.

21  So I don't think it has any --

22      MR. MINKIN:  No, I understand that, but --

23      THE COURT:  -- particular significance in your case.

24      I'm not holding against her that she filed a motion

25  to -- about her attorney.  That's certainly not going to be a

1    basis I'm going to look at in terms of aggravation or

2    mitigation.  I mean, to the extent that she has not shown any

3    remorse or any responsibility for her conviction, yes, with

4    regard to that, but not that she filed a motion with regard to

5    her attorney.

6            MR. MINKIN:  I would disagree with Your Honor,

7    respectfully, about remorse because we signed a payment plan,

8    we signed a stipulation for forfeiture.  Those are significant

9    factors to comply with the plea agreement.

10            THE COURT:  Right, but that's not a sign of remorse.

11            MR. MINKIN:  The payment plan, there was no need to

12    set up a payment plan, Your Honor.

13            THE COURT:  Well, that's inures to her benefit.  I

14    mean, the government has the right -- she agreed in this plea

15    agreement to the forfeiture.

16            MR. MINKIN:  I know.  I agree.

17            THE COURT:  The government didn't have to take it on

18    a payment plan.

19            MR. MINKIN:  But she's making the effort to pay back

20    a certain amount of money each year that literally will save --

21            THE COURT:  That she illegally benefitted from and

22    obtained as a result of her offense.

23            MR. MINKIN:  As an intermediary with these other

24    individuals, and that's something -- and I have a chart and I

25    have a handout, if it will assist -- may I approach, Your

UNITED STATES DISTRICT COURT

1    Honor?

2                THE COURT:  You may -- well, I mean, what do you

3    want to do?

4                MR. MINKIN:  I want to put this up and I've given

5    copies to the U.S. attorneys -- Assistant U.S. attorneys.

6                THE COURT:  Where do you want to put it up?

7                MR. MINKIN:  (Pointing.)

8                THE COURT:  Oh, on the easel, okay.

9                MR. MINKIN:  On the tripod, please.  And give me one

10   second, please.

11         And may I hand this to the clerk?  This is a smaller one

12   for --

13               THE COURT:  You just have to be by a microphone.

14   You have to be by a microphone if you're going to speak.

15         Okay.  All right.  Thank you.

16               MR. MINKIN:  Thank you, Your Honor.

17         What I've done is I've put up a chart, and if you're

18   unable to see it, I've handed out to both yourself, the

19   Assistant U.S. Attorneys, a chart that basically outlines our

20   position that the principals in this case were Elliott Broidy,

21   Steve Wynn, Pras Michel, and Jho Low.  Ms. Nickie Mali Lum

22   Davis was not a principal.  She's charged with aiding and

23   abetting.  She was an intermediary.

24         And what happens with Elliott Broidy, his actions?  He

25   spoke with President Trump about Jho Low's case.  He attempted

UNITED STATES DISTRICT COURT

1   to arrange meetings with top administration officials for the

2   prime minister of Malaysia as well as a Chinese government

3   official.  He convinced Steve Wynn to assist in his lobbying

4   efforts.

5        What is Mr. Broidy's background or history?  Felony

6   conviction for bribery that was later lowered to a misdemeanor

7   for cooperation.  He is also the individual that utilized

8   Michael Cohen to pay off a pregnant Playboy Bunny that he

9   impregnated.  Punishment:  He pled to one count of felony

10  conspiracy to commit a FARA violation and then he was later

11  pardoned by the president.  No fine, no sentencing.

12       Steve Wynn, he spoke with President Trump and the

13  national security advisor along with the team about returning a

14  Chinese fugitive to China after a conversation with -- excuse

15  me -- with a senior Chinese government official.  History:  He

16  had numerous business interests and permits pending for casino

17  operation in Macau controlled by the Chinese government worth

18  billions.  He is currently facing multiple sexual harassment

19  lawsuits, forced to resign from his own company after those

20  allegations.  Criminal case in those situations, pending, or

21  civil case.  Punishment:  Guarantee of no criminal prosecution

22  prior to speaking to DOJ, only enforced a civil FARA action,

23  and they did so, simply requesting him to back register for his

24  work.  And then the case was dismissed when a court held that

25  the DOJ cannot ask a person to back register.  No fine, no

1    criminal prosecution.

2          Numerous -- 18 other numerous individuals, lawyers,

3    consultants, lobbyists, attorneys that were paid for their work

4    on behalf of Jho Low, paid by the same individual that paid

5    Ms. Davis, Michel, and Broidy.  Punishment:  All of them back

6    registered on October 31, 2018, including a woman who later

7    went to work for DOJ.

8          Nickie Davis never spoke to a government -- U.S.

9    government official, never had Jho Low's phone number, only

10   relayed messages back and forth between Michel and Broidy, no

11   prior record, pled to a single count of aiding and abetting

12   Broidy's FARA violations, a new charge that had never been used

13   before, no sentencing federal guidelines.  Government now

14   seeking 30 months -- or 24 to 30 months as well as failing to

15   acknowledge the government while doing so -- failing to

16   acknowledge the cooperation, and the cooperation got other

17   indictments, got other pleas, and other individuals brought

18   before the system that profited by this entire process.

19         What we have here is a situation where we have a woman

20   who basically should have thought twice about it, but got

21   caught up and got involved and collected money that is now

22   going back to the government.

23         We have an individual that literally provided that

24   cooperation.  That cooperation basically ended up getting

25   people -- like I indicated -- getting people indicted, getting

1  charged, and additional witnesses being brought forth.  The

2  government now says that she's no use to them whatsoever, but

3  Mr. Broidy's still available, even though he's been pardoned,

4  because he has the ability to testify and verify those same

5  things that Ms. Davis told this Court.

6       We would ask that this Court literally go with the

7  presentence guideline or the recommendation of three months.

8  We recommend that that is appropriate given the circumstance.

9       We would like to self-surrender given her history of

10  appearing every which way possible and self-report to Dublin

11  facility.

12       If I may just have a moment, Your Honor.

13       I apologize if I did not ask for probation.  We believe

14  that this has impacted Ms. Lum Davis significantly.  We believe

15  that probation would be appropriate with all of the usual

16  requirements for probation.  However, if the Court's inclined,

17  do not sentence Ms. Lum Davis to 24 to 30 months.  It is not

18  appropriate given the facts of this case, given the nature of

19  this case, and all of the other parties that were involved.

20       Thank you, Your Honor.

21       THE COURT:  All right.  Thank you.

22       Ms. Lum Davis, do you wish to say anything on your

23  behalf?  You do have the right.  If you don't, it won't be held

24  against you, but certainly this is your time, if you wish to.

25       THE DEFENDANT:  Well, Your Honor, thank you for the

UNITED STATES DISTRICT COURT

1    opportunity to present a letter to you, which I did before

2    sentencing, and I think that had all the things I wanted to

3    say.

4        If you would like me to respond to any of the numerous

5    text messages that Mr. Keller went through, because I think we

6    all know that text messages can be taken out of context, then I

7    welcome -- I am open to be able to answer all of your

8    questions.

9        I'm totally going off script here, but when I didn't do

10   that before, I got into a lot of trouble.  So I'm just going to

11   answer any questions you have of me because, I mean, I never

12   had the government connections.  I never spoke to anybody.  But

13   when they went through these text messages, it sounded like

14   they were grouping me together with the efforts that Elliott

15   Broidy did, but I never spoke to any -- I was communicating,

16   "Hey, Pras is asking me did you get the meeting set up?  What's

17   going on?"

18       I was the middle person who knew Elliott Broidy and Pras,

19   so Pras was giving me pressure, I'm putting the pressure back

20   on Elliott Broidy 'cause he's the one who was very well

21   connected.  As Mr. Keller eloquently said, he was, you know,

22   this big Republican donor; he said he could get in touch with

23   Trump, he could talk to all these people, so that was

24   definitely what he was banking on, you know.

25       And I know my attorneys are -- probably want to kill me,

1  but I felt like if you want to ask me, I'm here.

2          THE COURT:  Well, I'm just going to ask you where

3  your letter is 'cause I've never seen it.

4          THE DEFENDANT:  Oh --

5          THE COURT:  Yeah.  I got Mr. McCorriston's letter.

6  I've got various letters in support, that's Exhibit B.  But if

7  you did submit a letter I never received it which is why I

8  indicated you didn't have any indication of remorse.

9      Did the government ever receive a copy of it?

10          MR. KELLER:  We did, Your Honor.  I believe it was

11  attached as exhibit perhaps in the response to the government's

12  sentencing memorandum?

13          MR. MCCORRISTON:  Your Honor --

14          THE COURT:  Yes.

15          MR. MCCORRISTON:  -- the letter was attached to the

16  reply as Exhibit A.

17          THE COURT:  I have Defendant's Response,

18  but -- okay.  I see it at the end, yeah.  Okay.

19      Well, I'm going to take a look at it now.

20      I got to say if you're going to put your client's letter

21  to the Court, it's very curious to me that you give me a

22  billion people's letters and you don't give me hers until you

23  respond to the government's sentencing position.

24      But, you know -- and I did read your response with regard

25  to all of that.

UNITED STATES DISTRICT COURT

1              MR. MCCORRISTON:  It was attached to the response,

2    Your Honor.

3              THE COURT:  I know.  But if you're going to submit a

4    letter on behalf of your client, that should be the first thing

5    that's filed, not the last.

6              MR. MCCORRISTON:  Your Honor, it was referred to in

7    her response as well.

8              THE COURT:  Right, I read the response.

9         And I have it, yeah.

10             THE COURTROOM MANAGER:  Oh, you do?

11             THE COURT:  Yeah.  Okay.  Which I did read it -- I

12   guess that's where I got my impression the lack of remorse and

13   responsibility.  I don't see that letter taking responsibility.

14        But at any rate, is there anything else that you want to

15   say on your behalf?

16             THE DEFENDANT:  No.  Thank you very much, Your

17   Honor.

18             THE COURT:  All right.  Thank you.

19        All right.  The court's going to state the sentence and

20   the reasons for the sentence, and then I'll ask each of the

21   attorneys if they have any legal objections before I impose the

22   sentence.

23        Please stand, Ms. Lum Davis.

24        Based on the mitigating and aggravating factors that the

25   court has previously stated, you are committed to the custody

 1      of the Bureau of Prisons for a term of 24 months;

 2              Supervised release of three years;

 3              A fine of $250,000;

 4              Restitution's not applicable because the forfeiture;

 5              Special assessment of $100 for each count for a total of

 6      $100.

 7              The conditions of your supervised release are as follows:

 8              You must abide by the mandatory and standard conditions

 9      of supervision, including the following conditions:

10              Since you do not have a recent history of substance abuse

11      and the offense is not drug related, the court waives the

12      mandatory drug testing condition.

13              You must cooperate in the collection of DNA as directed

14      by probation.

15              You must report to the probation office in the federal

16      judicial district where you are authorized to reside within

17      72 hours of the time you are released, unless the probation

18      officer instructs you to report to a different probation office

19      or within a different time frame.

20              You must abide by the following Special Conditions:

21              The fine of $250,000 is due.  Any unpaid balance must be

22      paid during the period of supervision in monthly installments

23      of $10,000 or 25 percent of your gross monthly income,

24      whichever is greater, commencing 30 days after the start of

25      supervision.  The court may order this requirement to be

1    changed from time to time as your circumstances warrant, but no

2    court order shall be required for your voluntarily agreement to

3    pay more than the court-ordered amount.  Interest is waived

4    while you are serving any term of imprisonment -- actually, I'm

5    not going to impose interest, so it's waived.  And payments

6    must be made by payroll deduction when applicable.

7         You must notify the probation officer of any change in

8    your financial circumstances that affect your ability to pay.

9    Your financial circumstances must be reviewed by the probation

10   officer on at least an annual basis.

11        You must provide the probation officer access to any

12   requested financial information and authorize the release of

13   any financial information.  The probation office may share

14   financial information with the U.S. Attorney's Office.

15        You must apply all moneys received from any income tax

16   refunds, lottery winnings, inheritance, judgments, and any

17   anticipated or unexpected financial gains to the outstanding

18   court-ordered financial obligation at the discretion and

19   direction of the court.

20        You must not incur new credit card charges -- credit

21   charges, or open additional lines of credit, or apply for any

22   loans without prior approval of probation.  You must not borrow

23   money or take personal loans from any individual without prior

24   approval of probation.

25        You must maintain a single personal bank account,

UNITED STATES DISTRICT COURT

1  separate and apart from your spouse, any family members or

2  others, into which all income, financial proceeds, and gains

3  must be deposited and from which all expenses must be paid.

4      You must provide the probation officer with a signed

5  release authorizing credit checks and accurate financial

6  statement with the support -- with supporting documentation as

7  to all sources and amounts of income, all your expenses, and

8  any business you own, in whole or in part.

9      You must provide the probation officer with access to any

10  and all business records, financial records, client lists, and

11  other records, pertaining to the operation of any business you

12  own, in whole or in part, as directed by probation.

13     If you are self-employed, you must employ a bookkeeper

14  and/or accountant to manage your business records as to income

15  and expenses and profits and losses on a regular basis at the

16  discretion and direction of probation.

17     You must disassociate yourself from and not have any

18  contact with Low Taek Jho, aka Jho Low, Pras Michel, Elliott

19  Broidy, Broidy's wife, RR, and George Higginbotham.  Should

20  your family members work for any of these individuals or

21  companies owned in whole or in part by them, you must reside in

22  a residence separate and apart from those family members.

23     You must cooperate with the Internal Revenue Service and

24  State of Hawaii Department of Taxation and arrange for the

25  payment of delinquent taxes, interest and penalties, and the

UNITED STATES DISTRICT COURT

1    timely filing of tax returns and/or corrected amended tax

2    returns.

3          Finally, you must submit your person, property, house,

4    residence, vehicle, papers, or office to a search conducted by

5    a United States Probation Officer.  Failure to submit to a

6    search may be grounds for revocation of release.  You must warn

7    any other occupants that the premises may be subject to

8    searches pursuant to this condition.  The probation officer may

9    conduct a search under this condition only when reasonable

10   suspicion exists that you have violated a condition of

11   supervision and that the areas to be searched contains evidence

12   of this violation.  Any search must be conducted at a

13   reasonable time and in a reasonable manner.

14         For the basis of the aggravating factors, the court

15   reviewed your personal characteristics, so forth, as it stated,

16   and in light of the mitigating factors, court found that

17   there's no guidelines.  But in the court's mind, because of the

18   crime that was -- that you've been convicted of, because of the

19   factors the court stated, the range was between 18 and

20   24 months was a sufficient sentence that's not greater than

21   what's necessary to meet the goals of sentencing, and based on

22   the aggravating factors it merited at 24-month period of

23   incarceration.

24         Before I impose the sentence as stated, any legal

25   objections by the government?

UNITED STATES DISTRICT COURT

1              MR. KELLER:  No, Your Honor.

2              THE COURT:  By the defense?

3              MR. MINKIN:  None, Your Honor.

4              THE COURT:  All right.

5              MR. MCCORRISTON:  Did you want to state --

6              THE COURT:  Yeah, I'm going to address that in a

7    minute, Mr. McCorriston.

8         So the sentence is imposed as stated.  The court has

9    considered the advisory guideline computations, which weren't

10   any actually, and the sentencing factors under 18 U.S.C.,

11   Section 3553(a).

12        As I explain more fully in my assessment of the specific

13   aggravating and mitigating factors in this case, I have

14   considered Ms. Lum Davis's history and characteristics as well

15   as the serious harm to our community caused by her offense.

16        I paid special attention to the plea agreement.

17        I've read the letters received on her behalf, and I

18   believe the sentence provides just punishment and serves as

19   adequate deterrence to others.

20        I've considered the sentencing guidelines and the policy

21   statements and the law.

22        All right.  You did plead guilty pursuant to a plea

23   agreement.  In that agreement, Ms. Lum Davis, you did waive or

24   give up certain appeal rights.  If, however, you feel that you

25   have a basis to file a notice of appeal, there is a deadline to

1  do so, and that's within 14 days after your judgment is filed,

2  and that should be filed sometime this week.

3       If you file after the 14 days, you could be found to be

4  too late and to given up or waived your right to appeal.

5       Do you understand this?

6            THE DEFENDANT:  Okay.

7            THE COURT:  All right.  So I don't think there's any

8  objection to self-surrender; is that correct?

9            MR. KELLER:  Correct, Your Honor.

10           THE COURT:  She has no criminal record; she's been

11  compliant with pretrial release, so I think that's appropriate.

12           MR. KELLER:  Correct.  Agreed, Your Honor.

13           THE COURT:  So she will self-surrender.  We'll give

14  you a date, that's depending on the designation by the Bureau

15  of Prisons, and I can make any recommendations, if you wish me

16  to.

17           MR. MINKIN:  And we do, Your Honor.  We would like

18  that recommendation to Dublin, California.

19           THE COURT:  Because of the proximity to family?

20  Mr. Minkin?

21           MR. MINKIN:  Excuse me?

22           THE COURT:  You want me to recommend that, so I will

23  tell the Bureau of Prisons because of proximity to family?

24           MR. MINKIN:  Yes.

25           THE COURT:  Okay.


UNITED STATES DISTRICT COURT

1          MR. MINKIN:  And unless the Court would be willing

2   to do community -- do home confinement under the auspices of

3   probation?

4          THE COURT:  No.

5      Okay.  Did you have something that I needed to address,

6   Ms. Ing-Dodson?

7          THE PROBATION OFFICER:  No, Your Honor.

8          THE COURT:  All right.  Thank you.

9      Okay.  I'm sorry?

10         THE COURTROOM MANAGER:  The date?

11         THE COURT:  Yeah, if you would give us the date for

12  self-surrender.

13         THE COURTROOM MANAGER:  Your Honor, it will be

14  Friday, March 10th, 2023, to the facility designated by Bureau

15  of Prisons.

16         THE COURT:  Yeah, that would be by noon to the

17  facility designated by Bureau of Prisons.  Is that sufficient

18  time?

19         MR. MINKIN:  I was writing and I missed the date.

20         THE COURT:  I'm sorry.  March 10th by noon to the

21  facility designated by the Bureau of Prisons, and so I was

22  asking is that sufficient time since she'll be

23  self-surrendering at her -- traveling at her own expense.

24         MR. MINKIN:  Would it be possible to allow an

25  additional 30 days or so so that things could be set up for the

UNITED STATES DISTRICT COURT

1  daughter in California?

2          THE COURT:  Yeah, that's fine.  So you want -- that

3  would take us, Ms. Elkington, to April?

4          THE COURTROOM MANAGER:  April 14th.

5          THE COURT:  April 14th?  All right.  So April 14,

6  2023, by 12 noon to the designated facility.  You do have to

7  appear by that time.  And if for some reason you don't, a bench

8  warrant will issue for your arrest.  So make sure that you

9  self-surrender at that time.

10      I assume she's going to travel at her own expense, not at

11  the marshals'?

12          MR. MINKIN:  Yes, that's correct.

13          THE COURT:  All right.

14          MR. MINKIN:  And though the Bureau of Prisons will

15  make the final determination, did I understand the Court that

16  Court will at least attempt a recommendation at Dublin?

17          THE COURT:  Yeah.  I'm going to include that in the

18  judgment that the court recommends placement at BOP facility in

19  Dublin, California, because of proximity to family.

20          MR. MINKIN:  Thank you.

21          THE COURT:  All right.  The court will review the

22  forfeiture order.  The forfeiture order will be signed and then

23  attached as part of the judgment in this case.

24      All right.  Anything else on behalf of the government?

25          MR. KELLER:  No, Your Honor.

UNITED STATES DISTRICT COURT

1          THE COURT:  Mr. Minkin, anything on behalf of

2    Ms. Lum Davis?

3          MR. MINKIN:  Nothing.

4          THE COURT:  Ms. Ing-Dodson, anything else the court

5    needs to address?

6          THE PROBATION OFFICER:  No, Your Honor.

7          THE COURT:  All right.  Very good.  Then we stand in

8    recess.  Good day, everyone.

9          (Proceedings concluded at 2:41 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3              I, DEBRA READ, Official Court Reporter, United

4    States District Court, District of Hawaii, do hereby certify

5    that pursuant to 28 U.S.C. §753 the foregoing is a complete,

6    true, and correct transcript of the stenographically reported

7    proceedings held in the above-entitled matter and that the

8    transcript page format is in conformance with the regulations

9    of the Judicial Conference of the United States.

10             DATED at Honolulu, Hawaii, January 23, 2023.

11

12

13                        */s/ Debra Read*

14                   DEBRA READ, CSR CRR RMR RDR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT